UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

KATHERINE M. LASSEN AND JAMES                    CASE NO:
V. MAITLAND, AS PERSONAL
REPRESENTATIVES OF THE ESTATE
OF VICTOR I. MAITLAND,

       Plaintiffs,

vs.

NFL PROPERTIES LLC, NATIONAL
FOOTBALL LEAGUE, NATIONAL FOOTBALL
LEAGUE ALUMNI, INC., NATIONAL FOOTBALL
MUSEUM INC. d/b/a PRO FOOTBALL HALL
OF FAME, AND HAGGAR CLOTHING CO.,

       Defendants.
_____/

## PLAINTIFFS' VERIFIED COMPLAINT

Plaintiffs, Katherine M. Lassen ("Kathy") and James V. Maitland ("Jim"), as Personal

Representatives of the Estate of Victor I. Maitland, Deceased (collectively, "Plaintiffs"), sue

Defendants, NFL Properties LLC ("NFLP"), the National Football League ("NFL"), National

Football League Alumni, Inc. ("NFL Alumni" or "NFL Alum"), National Football Museum Inc.

d/b/a Pro Football Hall of Fame ("HOF"), and Haggar Clothing Co. ("Haggar") (collectively,

"Defendants") and state as follows:

## NATURE OF THE ACTION

1.    This action arises from Defendants' willful infringement of Plaintiffs' trademarks and

trade dress in: (a) the original "Gold Jacket", a gold blazer manufactured by Haggar and presented

1

by the HOF, NFL and NFL Alum to each year's class of inductees into the HOF, beginning with the class of 1978 and continuing through the present day (the "Gold Jacket"); (b) the original logos and shield emblems for the NFL Alumni (the "NFL Alum Logo"); (c) "The NFL Alumni Charity Golf Tour"; (d) the charitable organization known as "Caring for Kids"; (e) the "NFL Alumni Player of the Year"; (f) the "NFL Alumni Player of the Year Awards Dinner"; and (f) "The Order of The Leather Helmet" (collectively, the trademarks and trade dress will be referred to as the "Marks"). Defendants' intentional and calculated infringement on the Marks was part of their scheme and combined efforts to: (1) erase the NFL history and legacy created by Victor Maitland ("Vic"), including his well-documented existence as the real person behind the creation of the Gold Jacket and the other Marks; and (2) in an effort to wrongfully profit from their copied and mimicked versions of the Marks and the worldwide recognition these versions of the Marks have achieved as part of Defendants' branding  and national and international footprint. Beginning in 1977, Vic designed, created, and launched the Marks into commerce. Upon information and belief, fully aware of Vic's ownership of the Intellectual Property rights in the Marks, and the impact the Marks have made in the storied history of the NFL, Defendants conspired to wrongfully profiteer from the brand created by Vic and have purposefully worked to copy, mimic, and replicate the Marks in order to promote their own brands and to wrongfully, upon information and believe, generate hundreds of millions of dollars in revenue over the past decades. Defendants misappropriated and misrepresented the Marks, spun them as their own creation, made some minor name changes or slight design looks, and then used and marketed their versions of the Marks in

commerce under confusingly similar names or concepts.

2.      As set forth in detail below, all of the Defendants have wrongfully infringed upon Vic's Gold Jacket concept and blazer design without authorization by falsely marking, advertising, and presenting the one-of-a-kind Gold Jacket blazer to all new HOF inductees, which have been supplied by Haggar to the Defendants since they were introduced by Vic as head of the NFL Alum in 1977, and in promoting, advertising, and designating their HOF ceremonies, awards, presentations, goods, and services beginning with the first HOF inductees in 1978, and continuing through the present, which, after Vic ended his tenure with the NFL Alum in 1989, began to utilize their mimicked versions of the Gold Jacket Mark.

3.      Beginning in 1977, Vic's idea for the new NFL Alum included a change in brand identity and corporate image. His vision became reality when in 1977 Vic's artist designed and created the original shield patch for the NFL Alum Logo, a symbolic Gold Blazer, and the NFL Alum ring ("Vic's Original Works"). On July 15, 2025, the Estate of Victor I. Maitland submitted a copyright application on Vic's Original Works with the United States Copyright Office, under Case # 1-14961021281 (the "USCO" and the "Copyright"). The Copyright has been fully submitted and marked pending.

4.      Since Vic first launched the Gold Jacket Mark into commerce in 1977, the Gold Jacket has become the iconic and universally accepted "gold standard" of achievement and the highest level of recognition in professional football. Defendants' misappropriations of the Gold Jacket Marks, both in mimicked or copied logos or names, and in the Gold Jacket blazers

3

themselves, include their wrongful promotion, advertising, commercialization and use beginning with the 1989 incoming class of HOF inductees, the first HOF Enshrinement year after Vic departed from the NFL Alum, in their collaborated presentation of the Gold Jackets through the present day during HOF Enshrinement, HOF week events, dinners and ceremonies leading up to, including, and after the HOF induction ceremonies. Defendants also misappropriated the Marks in branding, advertising, and marketing by using their mimicked versions of the Gold Jacket Marks, beginning in 1989 and through the present, to promote the sale of HOF packages for HOF ceremonies, goods and services, including the derivation of, upon information and belief, hundreds of millions of dollars in revenue generated from goods, services and broadcasts of these HOF related events on television, the internet, and social media.

5.   As set forth above, in 1977, Vic originally designed, created, and launched the original shield patch for the NFL Alum Logo, a prototype and symbolic Gold Blazer, and the NFL Alum ring pending Copyright approval in the USCO. Vic intended that the Gold Blazer distinguish Hall of Famers, who he believed should wear the gold jackets, from the regular or associate members of the NFL Alum, who he thought should wear navy jackets. This was the origin of Vic's vision to create "*the gold standard"*, a "Gold Jacket" symbolizing prestige, honor, and the lasting distinction of success within the NFL, the NFL Alum and the HOF. The inaugural Gold Jacket was awarded and given to the 1978 Class of HOF Inductees with Vic's original NFL Alum shield, one with stars on it, (the "1978 Gold Jacket"), which, with a caricature of Vic on the left photograph, looked as follows:

4

*[photographs of the original NFL Alum shield appear at the top of the next page]*

 

6.     In his continued commercial use of the Gold Jacket Mark, Vic met with Pete Rozelle, then Commissioner of the NFL, about the Gold Jackets in May 1978 in Canton, OH . Pete Rozelle personally asked Vic to revise the NFL Alum Logo on the 1978 Gold Jacket because it somewhat resembled the NFL's Logo, which he did. At the meeting, as chronicled by Vic in his 1978 little black book diary, Pete Rozelle agreed and signed his initials on the new NFL Alum Logo Vic presented to him, one without stars, in that Canton, OH restaurant. The agreement between Pete Rozelle and Vic was then reached to have the incoming 1979 HOF inductees wear Vic's Gold Jacket with the new NFL Alum Logo. (the "1979 Gold Jacket"). The new inductees tried on their Gold Jackets for size in the back of the restaurant. Given the historical significance of the meeting, Vic memorialized the meeting in his 1978 little black book diary ("Vic's 1978 Diary") and made video and audio recordings in which Vic recounted his creation of the NFL Alum Logo and the Gold Jacket and several of his meetings with Pete Rozelle including NFL Commissioner Rozelle's written approval of Vic's revised NFL Alum Logo and use of the Logo

on the Gold Jackets from 1979 to 1988. Plaintiffs are in possession of these unreleased video and

audio recordings. Vic's 1978 Diary chronicled the May 1978 meetings with Pete Rozelle in



Canton, OH as follows:

7.      Notably, Vic's 1978 Diary also confirmed that he met with Pete Rozelle again in Canton, OH during the 1978 HOF week, on July 27-30,1978, to discuss the logistics of how the 1979 Gold Jackets would be presented to the 1979 Class of HOF inductees. Vic confirmed and reported the meeting in the unreleased video and audio recordings and in Vic's 1978 Diary as follows:

*[Vic's 1978 Diary reflecting the July 1978 meetings appear at the top of the next page]*



8.      Vic's 1979 Gold Jacket was used by the NFL, NFL Alum and the HOF for HOF induction ceremonies from 1979 to 1988, at which time Vic stepped down from his ten (10) year tenure as head of the NFL Alum Logo. The NFL Alum crest shields for the Gold Jackets used for the 1979 to 1988 HOF induction ceremonies presented as follows:

9.     After Vic departed from the NFL Alum in 1989, Defendants were, upon information and belief, fully aware of Vic's ownership of Intellectual Property rights in the Marks, and the impact the Marks began to have on the storied history of the NFL. Beginning in 1989, Defendants began conspiring to wrongfully misappropriate from the brand created by Vic and purposefully worked to copy, mimic, and replicate the Marks by using the spun versions of the Marks as if they owned the Intellectual Property, with some minor name changes or slight design looks, and then using and marketing their versions of the Marks in commerce under confusingly similar names or concepts.



10.     In fact, Defendants began to misappropriate the Marks in their collaborative presentations of the Gold Jackets used for 1989 HOF induction and related services and goods, (the "1989 Gold Jackets") by "changing" the emblem/shield on the 1989 Gold

Jackets (from Vic's Gold Jackets used from 1979 through 1988) to now indicate " *NFL Alumni and Pro Football Hall of Fame Enshrinee"*. In fact, Defendants have continued to misappropriate the Marks by using the same emblem/shield design of the 1989 Gold Jackets for their HOF induction ceremonies from 1989 to 2010, which is presented as follows:



11.     In furtherance                                      of their entangled scheme, Defendants unsuccessfully guised their attempt to further distance themselves from the misappropriation by changing the emblem/shield on the Gold Jacket again, this time for the HOF class of 2011 inductees (the "2011 Gold Jackets"), now deleting any reference to the NFL Alumni. The Defendants have collaboratively used the 2011 Gold Jackets in HOF inductions, goods and services from 2011 to the present. The "newly minted", yet still copied and mimicked, emblem/shield used on the 2011 to the present Gold Jackets presents as follows:



12.     Thus, Defendants' thinly veiled attempt to obliterate Vic's name and his very existence in NFL history culminated in 1989 after Vic stepped down as head of the NFL Alum. At that time, Defendants' combined campaign of misappropriation began when they started to mimic, imitate, and intentionally infringe upon Vic's initial 1978 Gold Jacket and his 1979 through 1988 Gold Jackets, by using their copied, mimicked and spun versions of the Marks in their confusingly similar Logos used on their 1989 Gold Jackets-used for their HOF induction ceremonies from 1989 to 2010- and then for their Gold Jackets from 1989 through the current day.

13.     Vic originally designed and first used the original NFL Alum Logo Mark in commerce in July of 1977. He continued to use the Gold Jacket trade dress and Marks, with two similar designs in the 1978 Gold Jackets and the 1979 Gold Jackets-used from 1979 through 1988-in developing the NFL Alum into a national brand until 1989 when he stepped down as an advisor and independent contractor heading the NFL Alum. As outlined above, in 1989 Defendants began

their quest to eliminate Vic's documented affiliation with the Marks, and the legacy he created in NFL history, by misappropriating the two NFL Alum Logo Marks used by Vic in commerce from 1977 to 1989.

14.     Commencing in 1989, Defendants intentionally infringed upon Vic's original NFL Alum Logo Mark by collaboratively using it in their patently obvious and mimicked, copied, and confusingly similar Logos:



15.     As set forth in detail below, Defendants have also knowingly used Vic's Marks in the NFL Alumni Charity Golf Tour"; the charitable organization known as "Caring for Kids"; the "NFL Alumni Player of the Year"; the "NFL Alumni Player of the Year Awards Dinner"; and "The Order of The Leather Helmet." Through their joint and undeniable misappropriation, Defendants have acted and continue to act as if Vic never existed by wrongfully and falsely marking and falsely designating their mimicked and spun versions of their Marks as their own Intellectual Property.

16.     Equally, if not even more tellingly, on January 27, 2001, the NFL Alum proclaimed

that Vic was a: "**LIFETIME HONORARY PROFESSIONAL MEMBER.**"  In fact, the NFL Alum adopted and issued the following Proclamation (the "Proclamation") which plainly acknowledged and confirmed Vic's design, creation, and first use of the original Marks in 1977:

*[the complete Proclamation continues on the following page]*

# Proclamation



BE IT REMEMBERED THAT at a full meeting of the Board of Directors of the National Football League Alumni, Incorporated, held on the twentieth day of October, two thousand, the following proclamation was adopted.

WHEREAS, in the history of the National Football League Alumni, Incorporated, Victor I. Maitland occupies an honored place; and

WHEREAS, in 1977, Victor I. Maitland conducted and implemented a plan for the organization's future viability and growth by restructuring into a 501 (c) (3) charitable and educational institution with a motto and mission of Caring for Kids; and

WHEREAS, Victor I. Maitland established the NFL Alumni Charity Golf Tour, which enters its third decade of existence and continues to donate well more than $1 million annually to youth-related charities nationwide; and

WHEREAS, Victor I. Maitland was the driving force behind the institution of the now-established tradition whereby the National Football League Alumni presents the famed "gold jackets" to each year's class of inductees into the Pro Football Hall of Fame; and

WHEREAS, Victor I. Maitland created the NFL Alumni Player of the Year Awards Dinner, whereby former NFL players honor their modern counterparts and are in turn honored for their valuable contributions to the storied tradition of professional football, and that, in its nineteenth year, has become a principal fundraising event for the organization and one of the premier events of each Super Bowl weekend; and

WHEREAS, Victor I. Maitland created Pro Legends, Incorporated, a wholly owned subsidiary of the National Football League Alumni, Incorporated, initially to benefit the pre-59ers and, ultimately, to help perform the organization's secondary mission of helping its own; and

WHEREAS, Victor I. Maitland successfully lobbied for a presidential resolution that officially proclaimed the first week of the National Football League pre-season as NFL Alumni Youth of America Week, which since its inception has directly benefited hundreds of thousands of youths and their families nationwide; and

WHEREAS, through these and numerous other programs implemented with vision and energy, Victor I. Maitland was instrumental in transforming the National Football League Alumni, Incorporated, into a service organization that is nationally recognized and respected, that has helped promote the rich heritage of professional football, that has assisted former players, particularly those in need, and, most importantly, that, for the past quarter of a century, has made a positive difference in the lives of countless children and their families nationwide.

NOW, THEREFORE, by virtue of the authority vested in me as President and Chief Executive Officer of the National Football League Alumni, Incorporated, I, Frank W. Krauser, do hereby proclaim Victor I. Maitland to be recognized as a

### LIFETIME HONORARY PROFESSIONAL MEMBER

of the National Football League Alumni, Incorporated. Given under my hand on this twenty-seventh day of January in the year of our Lord two thousand and one.

*Randall H. Minniear*

RANDALL H. MINNIEAR
NFL Alumni Chairman of the Board

*Frank W. Krauser*

FRANK W. KRAUSER
NFL Alumni President
and Chief Executive Officer



17.

Plaintiffs bring this action for trademark and trade dress infringement, false designation of origin, false association, false advertising, and unfair competition under Federal and Florida statutory and common law, to ensure that the public is made aware of Vic's legacy in the NFL and so that the millions of NFL fans are not confused, deceived or misled into believing that it was, and still is, the Defendants who were, and still are, the "Men (and organizations) Behind the Gold Jacket" and the creators of the other Marks. This confusion and deception is readily apparent in the widely televised HOF weeklong festivities, events and awards dinners, including the induction of the new class of HOF members, presentation of the Gold Jackets; and in Defendants advertising, promoting, and commercially exploiting their spun versions of the Marks in other goods and services for significant personal gain. By their misappropriation and attempted evisceration of Vic's name and legacy from NFL history, Defendants conduct was and is aimed squarely at convincing their millions of national and international followers that their versions of the Marks originated from within and their own brands, when, in fact, the documented history revealed that Vic was the true "Man Behind the Gold Jacket" and the other Marks. In light of the Defendants' disingenuous actions, the mimicked and copied Marks have falsely become symbolic and represent the focal points of their national and international brands.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.§ 1332 (a)(1) in that Plaintiffs and the Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of costs and interest.

19.     This Court also has jurisdiction pursuant to 28 U.S.C.§ 1331 and 1338 (a) and (b) and 15 U.S.C §1125 (§43(a) of the Lanham Act), the statutory protection against unfair competition under the Lanham Act §43(a); and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") (Fla. Stat.§§ 501.201 to 501.213).

20.     This Court has personal jurisdiction over Defendants because they advertise, market, distribute and/or sell items which infringe upon and dilute the Marks throughout the United States, including advertising, promoting and selling infringing services and items to customers within this judicial district.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2) because Defendants conduct, transact, and /or solicit business in this judicial district, such that their contacts with this district subject them to personal jurisdiction with respect to this action and, upon information and belief, a substantial part of the events, omissions, or commissions giving rise to Plaintiffs' claims, specifically Defendants' unfair competition and infringements and dilution of Plaintiffs' Marks, continue to occur in this judicial district, causing damage to Plaintiffs in this judicial district, which is also the district in which Plaintiffs reside.

## **THE PARTIES**

22.     When he passed away on November 29, 2019, at the age of ninety-eight, Vic left behind an extensive legacy of accomplishments, including his own creation, design, and first use of the Marks, as described above and in detail below. Vic is survived by his five children, including

15

his daughter Kathy and his son Jim, who are the Personal Representatives of Vic's Estate. (the "Estate"). Both Kathy and Jim are citizens and reside in Florida.

23.     Defendant, NFLP is a Limited Liability Corporation organized and existing under the laws of Delaware and maintains its principal place of business at 345 Park Avenue, New York, NY 10154.

24.     Defendant, NFL is a trade association made up of and financed by its member teams and maintains its principal place of business at 345 Park Avenue, New York, NY 10154.

25.     Defendant, NFL Alum is a foreign not-for-profit corporation and maintains its principal place of business at 8000 Midlantic Dr., Suite 120S, Mount Laurel, NJ 08054.

26.     Defendant, HOF is a foreign not-for-profit corporation and maintains its principal place of business at 2121 George Halas Drive, Canton, OH 44708.

27.     Defendant, Haggar is a foreign for-profit corporation and maintains its principal place of business at 1505 Lyndon B Johnson Fwy, Ste 600, Farmers Branch, TX, 75234-6074.

## FACTS RELATIVE TO ALL COUNTS

28.     Football was always an integral part of Vic's life. He played college football at Hobart College in Geneva, NY and was a unanimous UPI Little All-American selection at tackle before being drafted by the New York Giants in the fifth-round in 1944. After serving in World War II, Vic returned to America and discovered that in 1945 he had been traded to the Pittsburgh Steelers. A prominent Steeler fan offered him a job in his chosen profession of marketing, which

offered him a salary significantly more than the pay received by professional football players in the mid-forties, and he retired from the game.

29.    Over the next thirty-two (32) years, Vic founded Vic Maitland & Associates, Inc. ("VMA"), and spearheaded it to become a full-service national advertising agency with branch offices in Pittsburgh, New York, Chicago, and Fort Lauderdale. In the mid-1970's, Vic retired from his career as a well-respected advertising and consulting account executive. Vic sold VMA, his lucrative advertising agency, in 1977. At that stage of his life, Vic's five (5) children were married and out of the house, so he and Katherine, his beloved wife of sixty-six years, decided that it was time for Vic to hang up his cleats and retire.

30.    When he finally retired, the publicized announcement quoted a statement made by Vic many years before at a benefit, that, "when I retire, I would like to spend my twilight years working on behalf of kids, and further, I would do it for a $1.00 a year."

31.    Vic's short-lived retirement and life of living out the golden years in Florida changed abruptly in 1977 when Vic and his son John ("Jack") Maitland were invited by Bill Chip, a retired Marine Corps general and friend, to attend a reunion of old-time football players. The gathering turned out to be a meeting of the NFL Alum in Canton, OH. At that time, the sole purpose of the NFL Alum was to financially assist pre-1959 NFL players (the "Pre-59ers") who were excluded from pensions and benefits available for the other NFL players who played in the league after 1959.

32.    At the time of the 1977 meeting, the NFL Alum consisted of a loosely organized

fraternity with a mere few hundred members, with no real national presence, leadership, or plan going forward. They could not afford to pay a firm to help them structure, organize, and develop into their vision of becoming a nationally recognized charitable organization. Bill Chip and other members of the NFL Alum quickly realized that Vic was a lot more than just a former NFL player, he was also a visionary with a proven track record in management and consulting.

33.     At the request of Bill Chip and other NFL Alum members, Vic agreed to accept this new challenge to help redefine the NFL Alum. He even agreed to invest $50,000 (he spent $80,000) for a feasibility study to evaluate the best means to reposition and rebuild the NFL Alum. This included finding a cause other than themselves, the Pre-59'ers, which would benefit the NFL Alum and a plan to make it happen. This "study" quickly transformed into a sweeping reinvention plan with Vic at the helm.

34.     The plan created and implemented by Vic first included transforming The NFL Alum into a 501(c)(3) charitable organization in 1978. Vic personally secured the NFL Alum EIN # 59-1782262 (the "EIN") which remains active today. In fact, the very same EIN was used by the NFL Alum in its July 23,1993 licensing deal with NFLP to use the mimicked and spun version of Vic's NFL Alum Logo Mark which looked as follows:

35.



Further, Vic personally created, established, and first launched: (1) "Caring for Kids", a flagship program to help the youth of America enjoy a better tomorrow; (2) the concept and trade dress "Gold Jacket" in 1977 which was and is today universally recognized as the symbol of football greatness and given to each member of the new HOF class. As detailed above, in 1977 Vic originally designed, created, and launched the original shield patch for the NFL Alum Logo, an exemplar and symbolic Gold Blazer, the NFL Alum ring and tie. Vic's vision for the Gold Blazer was to use it to distinguish Hall of Famers from the regular or associate members of the NFL Alum and create "*the gold standard"*, a "Gold Jacket", which would honor the greatest heroes of the game and preserve their place in the history of the NFL.

36.     In addition to devoting a significant amount of his time, Vic spent more than one million dollars of his own money during his tenure as head of the NFL Alum which spanned ten (10) years helping to revive and reinvent the NFL Alum, including creating, developing, and first using the Marks in commerce. The well-defined and documented history of the NFL confirms that because of Vic's vision, hard work, and personal contributions, the NFL Alum became the oldest, most well-known and well respected and charitable retired player organizations in professional sports. The Marks are Vic's proprietary and intellectual property which passed to the Estate when he passed away in 2019. At no time did Vic assign, sell, or otherwise transfer ownership of the Marks to any of the Defendants. All of the Intellectual Property rights, title, and interest in the Marks remained with Vic individually as an advisor and independent contractor and now reside solely in the Estate.

37.     Vic's NFL legacy was further cemented in July of 1976, during the Hall of Fame weekend in Canton, Ohio, when the NFL Alum Executive Committee met to review and approve Vic's study and plan. In a pure gesture of labor of love for the game, Vic accepted the appointment to act as an advisor as the CEO and Executive Director of the NFL Alum. Vic worked for nothing and became an independent contractor for the NFL Alum "earning" a token salary of a dollar-a-year to put his plan into action.  Under Vic's tutelage, the new NFL Alum turned into one of today's most philanthropic sports organizations in America with a clearly defined charitable mission and a national brand.

38.     Bill Dudley, then President, happily reported Vic's commitment to the NFL Alum in the debut issue of the NFL Alum's Summer of 1977 *Time Out!* magazine (*"Time Out!"*). *Time Out!* contained Vic's original trade dress and concepts behind the Marks in 1977, including Vic's artist's rendition and sketches of Vic's original shield patch for the NFL Alum Logo, a prototype and symbolic Gold Blazer, and the NFL Alum ring to which the Copyright  in the USCO is pending. The *Time Out!* containing Vic's sketches appears as follows:

*[the relevant portions of *Time Out!* magazine continue on the following two pages] *

20



Official publication of the NFL Alumni, Fort Lauderdale, Florida.  Volume 1, Number 1, Summer 1977

# WELCOME TO THE NEW NFL ALUMNI, AND TO OUR NEW PUBLICATION, TIME OUT!

Ordinarily these pages will carry news, announcements, progress reports, and items of interest to alumni and our friends.  But this first issue will be different.  It is my official report to you on the proceedings of the Board of Directors' meeting held in Canton on July 29th, and of the decisions and directions that came out of it.

The Board met to review a proposal that had been jointly recommended by your officers, our tax attorneys in Washington, legal counsel Len Decof, and a management consultant firm that made a study of our association.

So we shopped around for consultant firms, and quickly found that we couldn't afford the ones with the right background, and the ones that we could afford didn't offer much.  We were unable to find the answers.

Then the answers found us.  General Chip, a close friend of Andy Farkas, recruited two new members last year -- Vic Maitland and his son Jack -- and we learned that they own a management consultant firm that is exactly what we had been looking for.  From offices all over the country, they had worked for some of the biggest corporations in the world -- The Great Atlantic & Pacific Tea Company (A&P), American Machine & Foundry (AMF), Columbia Gas System (the world's largest natural gas utility), and many others.  More important, their client list included several big non-profit associations one of them the biggest of its kind in the country.

We talked to Vic and Jack, explained what we were trying to do, and asked their opinion on the direction we should take.  They had some very good ideas right from the start, based on their past experience with associations, so we asked if they'd consider making that study for us as friends and fellow members.  They said they would.

And they did.  The finished prospectus that the Maitlands presented to Len Teeuws and me contained ideas, answers, and opportunities that could make the NFL Alumni everything that the founders had ever hoped, and more.  We reported on their findings and recommendations to Len Decof, Jim Castiglia, Andy Davis, Tom Scott, Leon Hart, and many other officers.  They all agreed that it was the answer to all our prayers, and that we should go ahead with it, full speed.  That was the purpose of the Canton meeting -- to present the Maitlands' prospectus to the entire Board.

Basically, their findings were that we have the nucleus of a great organization, and a potential to do a lot of good -- not just for the old pros, but for all retired players, and the game of football as well.

They recommended six steps to our objectives:

1. How to improve our present public image.
2. How to reorganize as a tax-exempt non-profit corporation.
3. How to increase our membership.
4. How to make ourselves more visible.
5. How to raise money for our programs and activities.
6. How to gain the influence we need to carry out our plans.

It is a program which, if properly executed, can make the NFL Alumni one of the largest and most respected organizations in the world of sport, and many times better able to serve our original purpose -- to help out the old timers.

The rest of this first issue of TIME OUT! is an outline of that prospectus, a report on the decisions we have made, and the directions we are taking.

Welcome, and read on.

*Bill*

Bill Dudley, President

...



*A. Vic's Creation, Use and Protection of the Marks*

39.      As part of his plan for the newly defined NFL Alum, beginning in July 1977, Vic personally devoted significant time and resources by creating and designing the original NFL Alum Logo Mark. As referenced above, the unreleased video and audio recordings made by Vic, which were also reported by Bill Dudley in *Time Out!*, confirmed that Vic secured NFL Commissioner Pete Rozelle's permission to use the NFL Alum Shield, revised by Vic, with the name ALUMNI written across it as depicted above in ¶ 8.

40.     Vic first launched his commercial use of the original NFL Alum Logo Mark on December 7, 1977, by personally and gratuitously changing the name of the building where VMA was located at 2866 East Oakland Park Blvd., Ft. Lauderdale, FL 33306, to the NFL Alumni Building  As part of his giving give back to the game he loved, Vic allowed the NFL Alum to run its National Headquarters out of the NFL Alumni Building without having to pay rent or reimburse Vic for the more than the one million dollars that he contributed to help establish the NFL Alum brand, mission, and national voice. In furtherance of Vic's commercial use the NFL Alum Logo Mark when he recorded his Fictitious Name Affidavit in the Official Records of Broward County on December 7, 1977, and published in the Fort Lauderdale News on November 14, 21, 28, and December 5, 1977, as follows:

41.     On or about January 20, 1978, Vic continued to commercially use the NFL Alum Logo Mark by prominently displaying it on the new NFL Alumni Building as follows:

 

42.     Since he launched the original NFL Alum Logo on December 7, 1977, Vic continuously used the two NFL Alum Logo Marks,  the 1978 NFL Alum shield with stars and the 1979 NFL Alum shield without stars, in commerce, including displaying it in all the NFL Alum promotional materials, advertisements, memberships, sponsorships, and other lucrative agreements to raise funds to help support the NFL Alum and its members. Vic's vision, branding

24

and commercial use of the NFL Alum Logo Mark helped him fulfill one of his biggest promises: securing pension parity for the once forgotten Pre-59'ers. During his tenure with the NFL Alum, and in less than ten (10) years, Vic convinced the NFL to contractually agree to issue royalty payments to the Pre-59'ers.

43.     As referenced *infra,* the debut issue of *Time Out!* pointed out "THE NEW NAME AND LOOK OF THE NEW NFL ALUMNI" and confirmed Vic's creation of the original NFL Alum Logo Mark and other Marks as part of his plan. In addition to Vic's unreleased video and audio recordings, *Time Out!* also acknowledged that (because of Vic's efforts), Pete Rozelle, "...came to our rescue and gave us permission to use the famous NFL shield with the word "ALUMNI across it", the 1979 NFL Alum shield without stars.

44.     *Time Out!* also contained Vic's Original Works, pending Copyright approval, which portrayed Vic's artist's sketches of Vic's 1977 prototype design of the "Gold Jacket" Alumni Blazer with the NFL Alum Logo Mark which was "gold for Hall of Fame members" and described how the blazers, and depicted items, will be, "... things we can all wear with pride. The patch and tie will be part of the free membership package...."  Vic's Original Works, including shield patch for the NFL Alum Logo, a prototype and symbolic Gold Blazer, the NFL Alum ring and tie Marks were depicted in the sketches in *Time Out!* are clearly and plainly displayed as follows:

[*Vic's sketches of the Marks depicted in *Time Out!* appear in full on the following page*]



THE NEW NAME AND LOOK
OF THE NEW NFL ALUMNI

Corporate law requires that we change our name to in-
clude the word "Incorporated", so we will be known as
NFL Alumni Incorporated -- NFL Alumni for short.

That forced us to redesign our emblem, but Pete Rozelle
came to our rescue and gave us permission to use the
famous NFL shield with the word ALUMNI across it.

These are artists' concepts of the emblem as a blazer
patch, embroidered in red, white and blue with the
word ALUMNI in gold.  An alumni blazer designed to
match the patch, blue for regular members, maroon for
associate members, and gold for Hall of Fame members.
A club tie with the emblem repeated in miniature, also
color coded to membership.  And the alumni ring, in
heavy gold with the owner's name cast into the side.

THE RING     THE BLAZER     THE PATCH     THE TIE

The designs aren't final; these are sketches of how
they may look.  They will be things we can all wear
with pride.  The patch and tie will be part of the
free membership package.  The blazer and ring will be
available (to members only) at special low prices.

45.     "The Order of The Leather Helmet" was also designed, created and first launched

by Vic in April of 1978 when the award was first presented at a convention and fundraiser held by

the NFL Alum at the Bahia Mar and Sunrise Musical Theatre. "The Order of The Leather Helmet"

idea and award developed by Vic to this very day represents the highest honor presented to those

individuals and institutions who have made significant contributions to the game of football and

the men who played it. At the 1978 convention, George Halas, Art Rooney and Pete Rozelle were

presented with the first Orders of The Leather Helmet and the awards and honors continue to be

presented to those deserving individuals today.

46.     Although Defendants have collaboratively tried to erase Vic's name and place in the great game of football, his written and confirmed legacy in NFL history, including his design, creation, and first use of the Marks in commerce, can never be erased. Vic's accomplishments and the Marks he created were readily acknowledged by the NFL Alum in its Proclamation, including: (a) Vic's "driving force behind the institution of the now-established tradition whereby the National Football League Alumni presents the famed 'gold jackets' to each year's class of inductees into the Pro Football Hall of Fame;" (b) Vic's establishment of "...the NFL Alumni Charity Golf Tour, which enters its third decade of existence and continues to donate well more that $1 million annually to youth-related charities nationwide";(c) Vic's creation of "...the NFL Alumni Player of the Year Awards Dinner..." which became the modern-day NFL Honors Show held before every Super Bowl and at which several of the most coveted and prestigious NFL awards are handed out, including the NFL Most Valuable Player, NFL Offensive and Defensive Players of the Year, NFL Offensive and Defensive Rookies of the Year, Coach of the Year, and the Walter Payton NFL Man of the Year. The NFL Honors Show is watched by millions of fans and generates significant television and other revenue for the Defendants; (d) Vic's creation of Pro Legends, Inc., a wholly owned subsidiary of the NFL Alum, initially to benefit the Pre-59ers and helping members; (e) Vic's successful lobbying for a presidential resolution by President Ronald Reagan that officially proclaimed the first week of the NFL pre-season as NFL Alumni Youth of America Week which has benefitted hundreds of thousands of youths and their families nationwide; (f) Vic's implementation of a plan for the NFL Alum's future viability and growth by

restructuring it into a 501(c)(3) charitable and educational institution which became the mission and motto of Caring for Kids created and launched by Vic; and (g) Vic's numerous other programs "with vision and energy" transformed the NFL Alum into a "nationally recognized and respected" organization that, "...for the past quarter of a century, has made a positive difference in the lives of countless children and their families nationwide". Despite Defendants' efforts to erase Vic's chronicled contributions, including his creation and first use of the Marks, the true history behind the Gold Jacket and other nationally recognized aspects of the Marks are now revealed in this Complaint for full disclosure to the public, including millions of NFL fans, and cannot be unwritten.

47.     Further, the Marks designed, created, and first launched by Vic in 1977, and used by him in commerce from 1978 through 1988, were instrumental and misappropriated by Defendants in their mimicked and copied versions for commercial exploitation since 1989, some thirty-six years.  Defendants' misappropriation of the Marks, and commercial use of the spun versions as part of their national and international brands has, upon information and belief, generated billions of dollars in revenue for the Defendants in the United States and abroad.

48.     Moreover, Vic spent great effort and resources on maintaining the reputation and goodwill and quality associated with the use of the Marks. Vic's painstaking adherence to only the highest quality standards in launching and promoting of the Marks has resulted in widespread and favorable public acceptance and recognition of the mimicked and copied Marks among the millions of NFL fans who to this day wrongfully believe that the Defendants are the men and

organizations behind their versions of the Marks.

49.     As a result of Vic's vision, energy, development, advertising, and promotion of the Marks, adherence to the highest quality standards, and sales success, the mimicked and spun versions of the Marks have become widely recognized in and associated with the legendary game of football.

50.     As part of their brand promotion, Defendants advertise, promote, and offer to the public, including millions of NFL football fans, goods, services, and products, including Gold Jackets to members of the incoming class of the HOF, and derive substantial television and other revenue through advertising, promoting, and selling tickets to HOF weekend packages, ceremonies, awards dinners, and other events associated with the HOF induction ceremonies by using, mimicking, copying and misappropriating the Marks. Upon information and belief, Defendants started using their versions of the Marks in or about 1989, long after Vic commenced first use of the Marks in commerce in 1977. Defendants have used and continue to use the mimicked and copied versions of the Marks to promote their brands for goods, services, and events that were and are identical or closely related to the Marks, including programs, events, awards, goods and services Vic previously offered and launched under the original and real Marks.

51.     Further, much like Vic did from 1977 to 1989, Defendants advertise their goods, services, and events utilizing and misappropriating the Marks in their spun versions on television, online and through social media.

52.     Presently, all Defendants collaboratively cross-sell, advertise and promote their

brands using the mimicked and copied Marks for commercial purposes. NFLP is the merchandising and licensing arm of the NFL. The NFL homepage at NFL.com has a direct link to the homepage of the NFL Alum at nflalumni.org which collectively advertises and promotes both brands by selling goods and services which mimicked, copied, and misappropriated versions of the Marks. The current NFL.com website cross-advertises and promotes the following:




53.     NFL.com also links the HOF homepage at profootballhof.com which promotes, advertises and sells HOF enshrinement packages, goods and services using the following depicted spun versions of the Marks:





54.     The NFL Alum website commercially misappropriates the Marks by the following advertisements and representations:



31

55.     While the NFL Alum website represents in a footnote that "© 2025 The NFL Alumni Association shield design are registered trademarks of the National Football League Alumni Association. The chapter names and logos are registered trademarks of the teams indicated. All other NFL Alumni-related trademarks are trademarks of the National Football League Alumni Association," none of the Defendants have ever or currently own any trademarks in the Marks.

56.     The HOF homepage also wrongfully cross-advertises, promotes, and commercializes the Marks, including Haggar's role in supplying the Gold Jackets since 1978, with the following advertisements and posts on the HOF homepage:

57. Haggar's homepage at Haggar.com cross-advertises, promotes, and capitalizes from its role as supplier of the Gold Jackets since 1978 by using, mimicking, and misappropriating the Marks throughout the website including:





58.     In 1978, Vic negotiated the first contract with Haggar to supply the "Gold Jackets" to the new HOF inductees with Sylvan Landau, then Haggar's Executive Vice President, Director of Sales and Marketing, and the Divisional President in charge of Haggar International. Upon information and belief, the HOF and Haggar recently announced a lucrative multi-year contract extension by which Haggar will continue as the Exclusive Provider of the Hall of Fame Gold Jacket which is presented to all living enshrines.

59.     Vic's 1985 diary (the "1985 Diary") confirms Vic's continued use of the Marks in commerce, including his communications with Sylvan Landau in September and October 1985 about Haggar's exclusive agreement to supply the Gold Jackets. Vic reported the communications and meetings with Mr. Landau in the 1985 Diary as follows:

*[The 1985 Diary with September and October 1985 entries appear on the next pages] *





60.     Defendants offer their services, goods, and products to millions of NFL fans throughout the State of Florida, the United States, and even abroad.

61.     Defendants' use of the spun and mimicked Marks has caused, and will likely continue to cause, actual confusion in the marketplace, harm to Vic's well deserved NFL legacy, and now the Estate's reputation and goodwill, and damages caused by their wrongful misappropriation of the Marks.

62.     Upon information and belief, Defendants are aware of the strength of the Marks, and the goodwill symbolized thereby, and that the mimicked Marks cannot be used as an indicator of source or sponsorship for the goods and services they are offering. Accordingly, Defendants have been engaging in the above-described unlawful activities knowingly and intentionally, or

36

with reckless disregard for Vic, and now the Estate's interests and ownership of the Intellectual

Property rights in the Marks.

## COUNT I- LANHAM ACT § 43(a) DEFENDANTS' VIOLATIONS BASED UPON TRADEMARK INFRINGEMENT

63.    Plaintiffs re-allege and re-adopt the allegations set forth in paragraphs 1 through 62

above as if fully set forth at length herein.

64.    With the use of the mimicked and copied Marks to promote their brands since 1989,

Defendants falsely mark, falsely advertise, falsely promote and designate their goods, services,

and products (collectively, the "Infringing Products") as being their own when, in fact, those

Infringing Products contain the mimicked, copied, and misappropriated Marks and Intellectual

Property owned by Vic, and now the Estate, the rightful owner of the Marks and brands; falsely

associate and falsely suggest to consumers, including millions of NFL fans, that they created and

are the genuine owners and designers of the mimicked Marks used for the Infringing Products;

palm off the use of the mimicked, copied, and misappropriated Marks in their Infringing Products

as their own, and commit acts of unfair competition to obtain and scheme together to eliminate

Vic's legacy and true identity as the "Man Behind the Gold Jacket" and the other Marks.

65.    Neither Vic nor Plaintiffs have authorized Defendants' separate and/or collective

use of their versions of the Marks in any manner.

66.    Defendants' past use and continued use of the mimicked, copied, and

misappropriated Marks in commerce in connection with their Infringing Products was and is

intended to cause, has caused, and is likely to continue to cause confusion, mistake and deception

among the general consuming public, including millions of NFL fans, and the football world as a whole, as to whether the Infringing Products bearing or using their versions of the Marks originate from, or are affiliated with, sponsored by, or were created, designed, first used, or were endorsed by Defendants, rather than Vic who designed, created and first launched the Marks.

67.     Defendants' false origin and misleading advertising further confuses the public by the HOF and Haggar websites which, through cross-advertisement, promotions, and misrepresentations, represent that Haggar created the Gold Jacket. As of July 2025, the HOF's official website and the linked Haggar homepage falsely represent that Haggar is the "creator of the Gold Jacket" as follows:





The Pro Football Hall of Fame and Haggar Clothing Co. announced a multi-year contract extension. Haggar will continue as the **Exclusive Provider of the Hall of Fame Gold Jacket** which is presented to all living enshrinees. The renewal also includes support as the presenting sponsor for **"Measurement Monday,"** a private orientation for the newly-elected class that takes place the day after the Super Bowl.

"We are proud to extend our relationship with Haggar as the creator of the Gold Jacket and appreciative for their role as the presenting sponsor for 'Measurement Monday.' Haggar exemplifies the Hall's standard of excellence and we look forward to our continued partnership," shared the Hall's Chief Partnership Officer **Pat Lindesmith**.

Haggar has been a proud partner of the Pro Football Hall of Fame and supplier of the Gold Jacket since 1978. This contract renewal exemplifies the strong relationship and alignment of two great brands.

"Haggar Clothing Co. is thrilled to extend our 40-plus-year relationship with the Pro Football Hall of Fame – a world-class organization that promotes the values of commitment, integrity, courage, respect and excellence. These values align closely with the 90-plus-year rich history of Haggar Clothing Co. and values of the millions of men who wear Haggar product each day," said **Paul Okimoto**, Senior Vice President of Marketing for Haggar Clothing Co.

68.     Defendants' foregoing acts constitute unregistered trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

69.     Upon information and belief, Defendants have acted with knowledge of Vic's design, creation, and ownership of the Marks and with the deliberate intention to unfairly benefit from Vic's hard work, dedication, personal contribution of more than one million dollars, and his vision and the incalculable goodwill symbolized thereby.

70.     Since 1989, Defendants have profited by making, upon information and believe, hundreds of millions of dollars from their unlawful actions and have been unjustly enriched to the detriment of Vic, and now the Estate. Defendants' unlawful actions have caused Plaintiffs' substantial monetary damage in an amount presently unknown, but in an amount to be determined at trial. Plaintiffs have been damaged and will be irreparably damaged by Defendants' unauthorized use and spun versions of the Marks.

## COUNT II- LANHAM ACT § 43(a) DEFENDANTS' VIOLATIONS OF 15 U.S.C. § 1125 (a) BASED UPON FALSE DESIGNATION OF ORIGIN, FALSE ASSOCIATION AND FALSE ADVERTISING

71.     Plaintiffs re-allege and re-adopt the allegations set forth in paragraphs 1 through 62 above as if fully set forth at length herein.

72.     Defendants' past use and continued use of the mimicked, copied, and misappropriated Marks in commerce in connection with their Infringing Products was and is intended to cause, has caused, and is likely to continue to cause confusion, mistake and deception among the general consuming public, including millions of NFL fans, and the football world as a

whole, as to whether the Infringing Products bearing or using the mimicked Marks originate from, or are affiliated with, sponsored by, or were created, designed, first used, or were endorsed by Defendants, rather than Vic who designed, created and first launched the Marks.

73. Defendants' acts constitute a false designation of origin, false association and false advertising and unfair competition in violation with Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C.§ 1125(a) and the common law of the State of Florida.

74. Upon information and belief, Defendants have acted with knowledge of Vic's design, creation, and ownership of the Marks and with the deliberate intention to unfairly benefit from Vic's hard work, dedication, personal contribution of more than one million dollars, and his vision and the incalculable goodwill symbolized thereby.

75. Defendants have profited by making, upon information and believe, millions of dollars from their unlawful actions in using the mimicked, copied, and misappropriated Marks in the Infringing Products in commerce as they contain the mimicked, copied, and misappropriated Marks, which are words, terms, names, symbols, or devices, or any combination thereof, that contain false designations of origin, false or misleading description of facts, or false or misleading representations of fact as to the nature, characteristics, qualities, or geographic origin of the mimicked, copied, and misappropriated Marks in the Infringing Products. Defendants have been unjustly enriched to the detriment of Vic, and now the Estate. Defendants' unlawful actions have caused Plaintiffs' substantial monetary damage in an amount presently unknown, but in an amount to be determined at trial.

## COUNT III- DEFENDANTS' VIOLATIONS OF FLA.STAT. §§ 501.201, ET. SEQ. BASED UPON DECEPTIVE AND UNFAIR TRADE PRACTICES

76.     Plaintiffs re-allege and re-adopt the allegations set forth in paragraphs 1 through 62 above as if fully set forth at length herein.

77.     Defendants' past use and continued use of the mimicked, copied, and misappropriated Marks in commerce in connection with their Infringing Products was and is intended to cause, has caused, and is likely to continue to cause confusion, mistake and deception among the general consuming public, including millions of NFL fans, and the football world as a whole, as to whether the Infringing Products bearing or using the spun Marks originate from, or are affiliated with, sponsored by, or were created, designed, first used, were endorsed by Defendants, rather than Vic who designed, created and first launched the Marks.

78.     The aforesaid acts of Defendants constitute violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat §§ 501.201, et seq.

79.     Upon information and belief, Defendants have acted with knowledge of Vic's design, creation, and ownership of the Marks and with the deliberate intention to unfairly benefit from Vic's hard work, dedication, personal contribution more than one million dollars, and his vision and the incalculable goodwill symbolized thereby.

80.     Defendants have profited by making, upon information and believe, millions of dollars from their unlawful actions in using the mimicked, copied, and misappropriated Marks in the Infringing Products in commerce as they contain the mimicked, copied, and misappropriated Marks, which are words, terms, names, symbols, or devices, or any combination thereof, that

contain false designations of origin, false or misleading description of facts, or false or misleading representations of fact as to the nature, characteristics, qualities, or geographic origin of the mimicked, copied, and misappropriated Marks in the Infringing Products. Defendants have been unjustly enriched to the detriment of Vic, and now the Estate. Defendants' unlawful actions have caused Plaintiffs' substantial monetary damage in an amount presently unknown, but in an amount to be determined at trial.

81.     Defendants' intentional and willful conduct has caused, and will continue to cause, Plaintiffs' irreparable harm unless enjoined, and Plaintiffs have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

(1) Finding that (i) Defendants have violated Section 32 of the Lanham Act, 15 U.S.C. § 1114,  and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a); (ii) Defendants have engaged in trademark and trade dress infringement, false designation of origin, false association, false advertising, and unfair competition under the common law of Florida; and (iii) Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, *et seq.*

(2)     Granting an injunction preliminarily and permanently restraining and enjoining Defendants, their officers, agents, employees and attorneys, and all those persons or entities in active concerts or participation with them, or any of them, from:

    (a) manufacturing, importing, advertising, marketing, promoting, supplying, distributing, offering for sale or selling any products or services which bear or make

use of  the mimicked, copied, and misappropriated Marks, or any other mark substantially or confusingly similar to the Marks, and engaging in any other activity constituting an infringement of any of Plaintiffs rights in the Marks; and

(b) engaging in any other activity constituting unfair competition with Plaintiffs, or acts and practices that deceive the public and/or the trade; and

(3)     Directing such other relief as the Court may deem appropriate to prevent the public from deriving any erroneous impression that Defendants' goods or services which contain the mimicked Marks used in the Infringing Products have been designed and/or  created  by Defendants, or have been authorized for use by Vic or the Estate.

(4)     Directing that Defendants account to and pay over to Plaintiffs all profits realized by their wrongful acts and directing that such profits be trebled in accordance with Section 35 of the Lanham Act, 15 U.S.C. § 1117 and Florida law.

(5)     Awarding Plaintiffs statutory damages in accordance with Section 35 of the Lanham Act, 15 U.S.C. § 1117.

(6)     Awarding Plaintiffs their actual damages in accordance with Section 35 of the Lanham Act, 15 U.S.C. § 1117 and Florida law.

(7)     Awarding Plaintiffs their costs and attorney's fees and investigatory fees and expenses to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117 and Florida law.

(8)     Requiring Defendants to deliver to Plaintiffs for destruction or other disposition all goods and services, advertising, promotional and marketing materials bearing or using the

mimicked, copied, and misappropriated Marks,, as well as all means of making same.

(9)    Requiring Defendants to remove from their respective Web sites at NFL.com, nflalumni.org, profootballhof.com, and Haggar.com all goods and services, advertising, promotional, and marketing materials and information bearing or incorporating the mimicked, copied, and misappropriated Marks.

(10)    Awarding Plaintiffs pre- and post-judgment interest on any monetary award made part of the judgment against Defendants.

(11)    Awarding Plaintiffs such additional and further relief as the Court deems just and proper.

———————————————————

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial on all issues so triable that are raised by this

Complaint.

Dated: August 6, 2025.

**CHUSID, KATZ & SPOSATO, LLP**
Attorneys for Plaintiffs
5850 Coral Ridge Drive, Suite 201
Coral Springs, Florida 33076
Tel: 954-340-2200
Fax:(954) 340-2210

By:       ***/s/Mitchel Chusid***
          Mitchel Chusid, Esq.
          Florida Bar No.: 879282
          mchusid@cksattorneys.com
          Jordan R. Chusid, Esq.
          Florida Bar No.: 124638
          jchusid@cksattorneys.com

45

STATE OF FLORIDA )
) ss:
COUNTY OF BROWARD )

Katherine M. Lassen and James V. Maitland, as Personal Representatives of the Estate of Victor I. Maitland, Deceased, being duly sworn, depose and say:

I have read the foregoing Verified Complaint, investigated the facts alleged therein and to the best of my knowledge, information and belief, the allegations contained in the Verified Complaint are true and correct.

_____
KATHERINE M. LASSEN
Dated: 7/18/25

_____
JAMES V. MAITLAND
Dated: 7/18/25

STATE OF FLORIDA

COUNTY OF Broward

The foregoing instrument was acknowledged, subscribed, and sworn before me by means of [ ] physical presence or [ ] online notarization, by Katherine M. Lassen and James V. Maitland this 18 day of July, 2025. They have produced _Florida Driver's Licenses as identification.

_____
Notary Public
Printed Name: Idalia Feliciano
(Place notary seal above.)



IDALIA FELICIANO
Commission # HH 641951
Expires June 18, 2029

44 of 36